We'll hear argument this morning in Case 14-1538, Life Technologies Corp. v. Promega Corp. Mr. Phillips. Thank you, Mr. Chief Justice, and may it please the Court. I think because this is largely an international trade case, it's probably useful to put this case in context and to compare it to the facts that gave rise to the passage of Section 271F that's at issue in this case. You'll recall that in the Deep South case, that was a case involving a shrimp deveiner in which all of the activities took place within the United States except for the final act that took less than an hour to assemble in a foreign country. In that case, this Court held even that was not within the meaning of the patent statute as it existed then, and Congress then acted to fill that particular loophole. The facts of this case seem to me to be the polar opposite of that. Life Technologies operates an enormous plant in England in the United Kingdom. It spends tens of millions of dollars on that plant. Four out of the five components that go into the creation of the kits that are at issue in this case are sourced outside of the United States. One inside. I'll come back to that in a minute. And as relevant to this litigation, all of the kits are sold outside of the United States. So that the only contact that any of this has with the United States is the fact that a single commodity product is shipped to England as part of the process for the fabrication of these particular kits. Now, that commodity product is called a TAC polymerase, which I will readily concede that when I think about what you buy off the shelf, I don't go to Costco to buy TAC polymerase. But I am told, and I think it's absolutely undisputed in the record, that this is a commodity. This is at the essence of what the Congress enacted in F-2, which is a staple article or commodity of commerce suitable for many non-infringing uses. And indeed, if you get online and put in TAC polymerase, you can find literally dozens and dozens of ways to purchase it online at this time. And that was true as much in 2006. It may have been a significant product in 1989, but clearly by 2006, it was a commodity. And so the question is, is whether or not simply by using a single staple article, Congress intended through 271 to declare that this is a violation. Sotomayor Could you tell me, is this product available outside the U.S.? Phillips TAC polymerase? Sotomayor Yes. Phillips Absolutely, yes. It's readily available throughout the world. There are a variety of manufacturers who make it.  But it's not written on that particular component. Phillips No, none of that exists any longer. No. As I say, it's a commodity product. The ---- Ginsburg Do we know why that particular component was exported from the United States? You said all the others were made in England. Phillips I mean, the key to this is you want to get the best quality product, presumably at the lowest possible price, and most of these were purchased, most of the TAC was and I suspect they just had a better supply arrangement. I mean, that's the key to this case in a lot of ways is what you're looking for is what are the best supply arrangements that you can make on a global basis? Can you get them in the United States? Can you get them outside the United States? And what it seems to me clear that Congress could never have intended was to in some way disadvantage U.S. manufacturers who are providing a particular staple. Indeed, I would read 271F2 as saying categorically that the one thing Congress did not want to do is to interfere with the ability of a manufacturer to provide a staple article as part of an activity outside of the United States. Kennedy If all of this had happened in the United States, would there have been a patent infringement suit that would have merit? Phillips Yes. If everything had taken place inside the United States, there would have been. Kennedy Under the U.K. laws, are patents generally enforced for items that are patentable in the U.K.? Phillips Yes. Yes, absolutely. And indeed, in this case, Promega, I think Promega, at least somebody had a patent in the U.K., but that patent had expired, which is candidly, not surprisingly, why the activity was taken. And that is ultimately, Justice Kennedy, the answer to these issues. If a patent holder in the United States is upset by the use of a particular invention outside the United States, the solution is to go outside the United States and see patent protection in that particular country. Kennedy I assume, though, that there might be other countries that are not so vigorous in their enforcements as the U.K. Phillips Well, I suspect that there may be, although, you know, this is broadly regulated by treaties. And to me, the key is, you know, the United States has agreed that each country should regulate its own patent rights. I mean, we bought into that deal in the Paris Convention in the 19th century and consistently have accepted that. And that's, and the whole theory of this is to ensure the free flow of commerce across borders on a regular basis, at least when we're talking about staple articles of commerce. You know, if, you know, where the Federal Circuit clearly got this wrong is in saying that you could interpret F-1, which talks about a substantial portion of the commodities, and say that a single commodity can be a substantial portion, when F-2 says that in order for a single commodity to constitute a, to give rise to a potential claim of a violation, what it has to be is especially made or especially adapted for use in the particular invention. Roberts Does substantial portion mean a majority? Phillips Oh, I think it means substantially more than a majority. I would, I would say that it has to be approximating or very close or tantamount to all. Roberts So here there were five components? Phillips Yes, Your Honor. Roberts And they would have to be all, all five would have to be made in the United States or more would be enough? Phillips I would have thought at least four would have to be, but I, you know, in many instances my guess is the right answer may well be five. Kagan Where do you get that from? What's the principle there? Phillips Because all Congress wanted to do was to close a loophole where you're essentially doing nothing but violating U.S. patent law and avoiding it by simply offloading it at the last second. And a lot of instances I don't think that's true when you're only talking about a majority of the items. Kagan Well, how do we know that that's all Congress wanted to do? I mean, that might have been the, the, the scenario in Deep South, but Congress used language that could refer to much more than that, that could refer to a majority, that even could refer to a substantial minority. Phillips Yeah. I, I think there's no way to, first of all, the, the rule against, the presumption against extraterritoriality would drive you in the opposite direction. Even if you could reasonably read the language either way, you would, you would drive it toward recognizing that the company that the substantial portion keeps is the word all, and it's talking about components. And so those are, to my mind, very much quantitative and driven in the direction of all. Ginsburg But you agree that substantial portion is an ambiguous term. Phillips Yes, Justice Ginsburg, I, I agree. It could be interpreted in either of two ways, which is why I think the principle against extraterritoriality drives you in the direction of saying Congress meant only to allow U.S. patents to operate outside the United States in very narrow circumstances. And if Congress chooses to, to create the kinds of international problems that will undoubtedly arise by an overbroad interpretation of 271F, which is what the Federal Circuit has adopted, leave it to Congress to go back and fix that. Because those are, those are issues of international relations. This seems to me Congress is in a much better position than the Court's to sort out. Kennedy Suppose there were just two components, the polymerase and then a patent, a second part of a patent that we'll invent. Phillips Right. Clearly in that situation there's, there's no liability because, because only one of those components, either one of two things happens, either both of them are being put together or, or only one of them is. And 271F1 Kennedy It seems, it seems to me that even if we, we agree with you that quantitative is, is the proper measure, you still have qualitative coming in to balance your judgment, as in the case of one out of two. Phillips Well, not in one out of two. One out of two seems to me is, is dictated by 271F2 that says that if it's only one and then it has to be either especially adapted or especially Kennedy Well, I'm just talking about F1. Phillips Oh, I'm sorry. I thought you were talking about one out of two components. I apologize. No, when you get to one, you know, there's no question that at some point as you're approaching all, but not all, that you're going to have to make some kinds of judgments. But it seems to me it's absolutely critical that the Court maintain a very significant numerical component to it. Otherwise, what you do is allow the, the, the extraterritorial principle not to have the full sway that it should be entitled to. Roberts I'm not sure I agree with your understanding of the extraterritorial principle. I don't, I mean, do you really take that down into the minutiae of every little clause? It seems to me it's when once the law applies, then you apply normal principles of statutory interpretation. I think we have cases about that in other, in other areas, which is sort of what is the reach? I think maybe the presumption against infringements and sovereign immunity. There's a case I can't recall right away that said, well, once you get over it, it's over, and then you apply normal principles. And I'm not sure at every turn, okay, and we know that this is a statute that obviously applies overseas. Phillips Mr. Chief Justice, that's exactly the opposite of what the Court said in Microsoft. In Microsoft, the Court said that the issue is not simply is this extraterritorial because there's no question that 271F operates extraterritorially. The question is the sweep of 271F. And this Court said that it was going to interpret the word component very narrowly in that context, candidly in the same way that this Court also interpreted it in the Deep South case, again, very narrowly. And we're asking you to do the same thing, which is to say adopt a narrow construction of the substantial component language so that it drives much closer to the word all and recognizes that this is meant as a Breyer Your real argument is just that, isn't it, that you interpret it differently than you do, and we cause a lot of problems in other countries. I mean, they can't tell whether when they get one component, their lawyer is going to have to know not only British law, it's going to have to know American law.  That's exactly right. It's a practical argument. Right. And it really, you don't need, well, it's up to you what you want to use. But I don't, the problem is if that's the point, why do you need this sort of grand thing about presumption against extraterritoriality? Well It's up to you what you want to use. Look, I'm perfectly comfortable with any policy argument you feel comfortable with. That one is certainly one that we embraced. I mean, the other policy argument that seems to me equally strong in this context is the mischief that the Federal Circuit's rule provides for trolls. Because now, not only do you have all of the trolls in the world looking for all of the products in the world, but now they're going to go through the entire supply chain of every putative infringer and go after each provider of a single staple article of commerce as part of this exercise. And it seems to me that cannot possibly be a commerce incentive. It's clear that the qualitative interpretation has a greater extraterritorial effect than the quantitative interpretation. What if you have a situation where, let's say there are ten components, and nine of them are made overseas. But those are very routine things. Those are like the product that's made in the United States here. You can buy them off the shelf. But there's one that's very unique. Now, it's not made specifically for this device. But it's very unique. And that's made in the United States. Phillips. Well, from my perspective, the only device coming from the United States is a single device, and it's not, and it doesn't satisfy specially made or specially adapted. It seems to me that F-2 tells you specifically that's not within the meaning of the statute. And if commerce wants to fix it, it can fix that. I'm not sure if that's true, Mr. Phillips. I mean, you're reading F-2 as having a negative implication that this is the only time when one component can create liability is when it's especially made or especially adapted. But these might be just independent clauses. In other words, F-2 talks about a component that's especially made, whether or not it's a substantial portion of the product. And then F-1 comes in and says independently creates a rule for a component or components that are a substantial portion of the product. So I'm not sure why we have to read F-2 as creating this negative implication as to any product, any single product, as opposed to just saying F-2 is about specially made stuff and it has nothing to do with F-1, which is not about specially made stuff and provides a different test about substantiality. Right. In the first instance, I don't think that's the more natural way to read the two together. But then I would go back and, without trying to offend Justice Breyer, go to the principle against extraterritoriality and say to you that if there are two different ways that are equally plausible to interpret this language, you should interpret the language to be more narrowly applicable and, therefore, less likely to interfere with extraterritorial application of patent law. And so that's the reason. I'm not saying you would have, in the abstract, been compelled to a particular conclusion. But in a situation where Congress has used the language, talking about all or a substantial portion where all is all but, you know, it's very close to that, talks about components of the invention, not of the invention itself. The Federal Circuit twice, in its opinion, just dropped out of the components of the invention, where it's clear that that's designed to be a quantitative analysis. Ginsburg. And what are the components of the invention? How do we know what the components of the invention? This Court in Microsoft said that the components of the invention are the elements in the claim. And so you look at the claim and you interpret the claim and you devise from that. Now, that's claim construction. And that's, you know, not always the easiest thing in the world to do. And it requires review of the claims, review of the specification and the history. But in this particular case, it's very easy. The claims say very categorically what each of the five components are, is, and so that one's easy. If there are no further questions, Your Honors, I'd like to reserve the balance of my time. Thank you, counsel. Mr. Tripp. Mr. Chief Justice, and may it please the Court, we're asking the Court to do two things here today. First, we're asking the Court to hold that the supply of a single commodity component is never enough. We think that's clearly right when you look at F-1 and F-2 together, especially in light of extraterritoriality concerns. Second, we're asking the Court to hold that F-1 reaches the supply of all or a large portion of the components of the invention, not any important portion of the invention. And the way we would put it is that it reaches the supply of all or something tantamount to all of the components. And our principal practical concerns here stem from the breadth of the Federal Circuit's ruling, and it's broad because they're asking a loaded question that's looking only at part of the picture. If you look only at the supplied portion of the components and you ask whether they are important or essential to the operation or novelty of the invention, the answer is always going to be yes. In most inventions, if you take away any component, it isn't going to work and it's not going to be patentable. So we think you just can't come at it that way. And then the second piece is that the Federal Circuit isn't looking at all the components that were not supplied. And so they're not asking the comparative question of whether the person has done anything similar to supplying all of the components. And we think that's just a critical piece here. This is an anti-circumvention provision. It was enacted to shore up the basic territorial restriction against actually making a patented invention in the United States and then shipping it abroad. And we think it needs to be interpreted with that purpose in mind. Sotomayor, you keep saying substantially all. Mr. Phillips argued that substantially all has to mean just that, almost all. You instead in your brief want us to keep that vaguer. But I'm assuming that there's a minimum that wouldn't constitute an infringement? 20 percent? 30 percent? 40? How? Yeah. So I think the one bright line that we're drawing here is on the face of the statute is that one is never enough. We think that's clear when you look at F-1 and F-2 together, the way this Court read them in Microsoft the first time. Beyond that, the numbers are very important under our test. But they are not the whole ballgame. We say this on page 26 of our brief. You could also you would look not only at the numbers of the components that were supplied and not supplied, but you would also look at the relative time, money, and effort that you would need to obtain the remaining components. So if I could give time, money, and effort, but not significance of the component? It seems to me that the significance of the component would be the most important consideration. In other words, if it's whatever you think is not quite enough, 70 percent, but 70 percent of the components, I mean, that's really the core of what makes it work. I don't know why you wouldn't look at that differently than if it's 70 percent, but the 70 percent are, you know, fairly insignificant. Well, our principal concern, as I was saying, is that if you just ask the question of whether it's significant in the sense of is it essential or important to the invention, I think that's just a black hole. It's not going to get you anywhere. And we think our approach works better. And if I could just give you two examples of how this would work using this particular invention. So if the record here showed that manufacturing the first component, the primer mix, was, you know, an incredibly difficult, time-consuming, hard, challenging process, the bulk of the work here, but that you could get the reaction buffer very quickly in a heartbeat, you know, it was like a dime a dozen, you drop it into the kits and it works. In that circumstance, if somebody supplied all the components except the reaction buffer, we think they would clearly be liable because they would have done something that is really tantamount to supplying all of the components. You could get that last one so easily. But if somebody supplied all the components. Sotomayor, to the expert testimony here, that out of the five, three were significant. So let's assume they supplied the three significant components and not the two insignificant. What would your answer be then? I think that would be a much closer case to supplying something that is tantamount to supplying all of them under our test. I think the record here isn't fully set out in terms of what it is that makes them main or major. What we're trying to get at, and the key point to us, whether exactly how you articulate this test, I think doesn't matter all that much to us. But what we really do care about is the idea that this needs to be a comparative inquiry looking at how much work there is left to be done to obtain the rest of the components so that. Once you're into your fairly complicated test, I mean, I think you're off to the races. I mean, what factors do you look at, all of that, when it seems to me the clear argument is whether you want to call it the plain text or not, but it's just focusing on a numerical. It's the substantial portion of the components. And now you're saying, well, it kind of depends on what components we're talking about, you know, how much time it takes to make them, effort. I don't quite understand what effort means in that area. In other words, you're compromising the principle in a way that really undermines the force of the principle. No. I think what we're saying is that the statute carries the quantitative meaning in the sense that it needs to be a large portion, but this is an anti-circumvention provision, and in trying to figure out what it means for it to be a large portion, the numbers are a whole lot of the picture. I don't want to diminish that. But as we said on page 26, we think they're not the entire ballgame, and a court could look at some qualitative factors, but that it would not look at the question of whether what's left on the table is essential or to the novelty, because the answer to that is always going to be yes. Sotomayor, I don't know enough patent law to have the answer to this. When a claim is made, what – how is a determination made of what the elements are? Do the elements' determinations sort out the common from the uncommon in a patent claim? Not as I understand it, no. It would just be sorting out what the elements are, and the way we approach the components of the invention – this is on page 27 of our brief – is we think, as in Microsoft, that they are – they need to be capable of combination, and they're derived from the elements of the claim. So we think in most cases it actually won't be that difficult, and also, as I was saying, I think under our approach, it also, frankly, won't matter that much. But why do we have to go into the details here? I mean, it did strike me as an instance where maybe the less said by us, the better. I mean, would you be happy if we say it means what it says? All or substantially all means a whole lot, or what you said, tantamount to all. So if you get into that circumstance, or you get into the two circumstance, which is there is a special ingredient here that has the special qualities, Mr. Manufacturer, don't get close to that. I think all these lawyers that will be there telling them, don't get close to that, and the thing will work out over time. If we set a detailed test down, all those lawyers will be trying to figure out how, in fact, they actually do the thing without quite infringing the detailed test. That's what worries me. I think if you said that one was never enough and it needs to be a whole lot, we would be quite happy. At the end of the case, it says one means a lot, we need a whole lot, tantamount to the whole lot, and good-bye. Yes. We would be perfectly happy with that. All that I'm trying to do is try and give you our sort of best gloss on interpreting this. And why did you add the qualification to put in qualitative considerations in addition to quantitative? Well, as I was trying to get out with the illustrations using this particular invention, like, you could get to a different answer even when you have the same number of components. So if somebody supplied everything but the reaction buffer, this one you get cheaply and easily, we think you would be liable. But if they did everything except the primer mix, and that's really just an enormous amount of what needs to happen here, then we think they wouldn't have done something that's tantamount to supplying all the components, and they wouldn't be liable because there would be so much left to be done. I mean, that's your answer in this invention. But every other invention is going to have a different mix of the time, the effort, the qualitative aspect. And again, it does seem to me that once you get beyond looking at purely and quantitatively in terms of the components, I don't think you've made much progress in clearing up the litigation costs and the confusion. And I'm also not sure how it fits in with the presumption against extraterritoriality, or at least the clear application of that. Well, I think the main thing that we're getting at is that, and again, as I was saying, I don't think we have a strong position on how exactly you articulate the test. Our concern is that it needs to be pinned to an anti-circumvention provision. And the question is, are you doing something that is pretty close to supplying all the components? How exactly are you- But the reason why is that almost all? I mean, if I said to you, Mr. Tripp, a substantial portion of my former clerks have gone into government work, how many would I mean? Well, I think with any of these things, the interpretation of substantial depends entirely on its context and its purpose. And so, this term is used in just like a countless array of ways in the law. So you're not pinning this on the language here, the substantial portion means almost all. You are finding it from someplace else, and where are you finding it from? So we're trying to give a gloss on substantiality in light of the context and purpose of this statute. As we understand, all of 271F is designed to shore up the basic restriction against actually making a patented invention in the United States and then shipping it abroad. Both of the provisions get at that. We think F-1 is situations that resemble the Deep South paradigm you're doing. But then you take Justice Alito's hypothetical, which is a product where there's a single component that is accounting for 90% of the time and effort and whatever the third thing you mentioned was. I think in the one is never enough, F-2 is just a complete answer to that. And if Congress was going to draft a special rule about the supply of an individual super important component, you would have expected to see it in F-2 and it's just not there. Thank you, counsel. Mr. Waxman. Mr. Chief Justice, and may it please the court. I think it's extremely important to understand how fundamentally the petitioners and the government misapprehend the nature of the harm that Congress addressed in 271 as enacted. When the Deep South solution was proposed by Senator Mathias, it precluded the supply with no active inducement requirement, the supply of the material components of a combination that if combined in the United States would infringe. In a 1984 hearing that's discussed at page 29 of our brief, the United States, the Commissioner of Patents came in and testified that the United States objected to that interpretation. They objected to the top down, not totally all. And proposed instead that Senator Mathias amend his legislation to preclude what in essence is prohibited domestically in 271C, that is contributory infringement. That is the supply of a single specially designed part where there are no substantial non-infringing uses. That in and of itself shows you how far, and that is in fact 271F2. And that shows you how far from this all or substantially all paradigm Congress was aiming. Now, Senator Mathias' response right there, and again we discuss it at page 29, was okay, I understand that. But what about, he said, the situation of the, quote, exporter who sends specific instructions on how to manufacture a product which would infringe a US patent, notwithstanding the use of a staple product or products. And Commissioner Mossinghoff's response was, gee, I hadn't thought of that. That would be the analog to 271B, that is the induced infringement requirement, which makes one liable as an infringer if you actively induce infringement by another. And- So you're beginning with a dialogue at a Senate hearing on the bill. That's pretty weak, even in the legislative history hierarchy. But I don't think you've mentioned the actual language of the statute. Well, that, thank you, Mr. Chief Justice. And I'm not relying on the legislative history alone. This is just one example in- How does it help you? Because it's very hard for me to believe that Senator Mathias really wanted to interpret American patent law so that it runs the world when we've entered into a treaty which says British patent law runs Britain, French, France, and so forth. I mean, is there something in this history which says, no, no, Senator Mathias had a different view. He wanted, whenever you send any component abroad that's in a patent, suddenly American law governs it. So, Justice Breyer, before I go back to the history, I'll take the Chief Justice's admonition and focus on the language. I mention the history, Mr. Chief Justice, only because it's rare that an exchange in the legislative history translates so directly to the language of the statute. As a result of that exchange, which we're not relying on as interpretive authority, Senator Mathias did exactly what the United States suggested. He scrapped the original, the material components, and came back with what is now 271F1 and F2. F1 modeled on 271B precludes active inducement in the United States, and 271F2 precludes following on 271C. Roberts, I know, but I mean, you know the objection. I don't know how many of the people voting on the bill went back and read the Senate hearing. I understand the argument when you're talking about something in the Senate report or the House report at a fairly high level of connection to the statute. But when you're wading into the particular dialogues at a particular hearing in one House, one committee of one House or the Congress, that's a real stretch. Okay. Let me put aside that exchange. In fact, the report does acknowledge what is obvious from the face of the statute and which I believe, and this Court recognized in Microsoft v. AT&T, which is the 271 provisions were modeled after induced infringement under 271B and contributory infringement under 271C. And that's the end. Alito, what about the text of the statute? It doesn't say a substantial portion of a patented invention. It says a substantial portion of the components of a patented invention. So if I were to, you know, if I were to ask what is a substantial portion of the pages of your brief, I think someone would think that's a quantitative determination and would not think that, well, you know, I think pages 12 to 16 of your brief are particularly important, so that would be a substantial portion of the pages of your brief. So I let me go first to the question about the use of the word components rather than invention, and then address your question on the substantial number of pages. This Court explained in Microsoft v. AT&T the use of the word components is that the Congress' indication that the combinations that are precluded are tangible or physical combinations, not method patents or unembodied software. That's how you know what the scope of the combination is. And if Congress had said, you know, to export one or more rather than a substantial portion, you would still use the plural, because the plural is necessary to accommodate the instance in which it will, in fact, commonly be more than one. Now, in your hypothetical, if you're talking about a substantial portion of units that are indistinguishable from each other, like pages of the brief, then I concede that the more natural reading is a quantitative one. But if you look at how substantial is used in the relevant provisions, the provisions of the patent code that my friend on the other side is adverting to, that is F-2, where substantial non-infringing uses is plainly, at least partly qualitative, or as they say, Warner-Jenkinson, the doctrine of equivalence case, where equivalency turns on substantiality of functions and methods and uses, it is also qualitative. Our argument is that, again, we agree with the United States, whether the extent to which substantial is qualitative or quantitative depends on the context. And so my only point, Mr. Chief Justice, just so that I'm not misunderstood here, is Congress, when Congress, rather than what it started to do, which was to count down, enact something that counted down from all the components, it instead scrapped it at the United States' suggestion and started from the ground up, from contributory infringement, which is just one component, specially designed, and active inducement, which doesn't require the supply of any components. Now, in this instance, and this goes, I think, to Justice Breyer's question about extraterritoriality, Congress was very careful. And, of course, as this Court recognized in Microsoft, there are extraterritorial implications because it concerns exporting things for something to be done in commerce overseas. But Congress was very, very careful to make the conduct that the provision looks at domestic only. It is, you have to actively induce from the United States, and active inducement, as this Court explained in the Grokster case, means active steps to encourage, like advertising or providing instructions. You have to support this. Ginsburg. What do you do with the word all? I take it your argument would be easier if that word were not in the statute. Oh, I don't think that I'm not — I don't agree that our argument would be easier. All, you know, has the same implications, one way or the other, whether you call it less substantial, quantitative, or qualitative. Clearly, Congress was aiming at less than all. But it's a commonplace for legislatures, for completeness' sake, to say all or fewer than all, or all or some. And, Justice Breyer, I do want to correct one thing. You inadvertently kept saying this is all or substantially all. It's not all or substantially all. It's all or a substantial portion. And as we point out in, I believe, page 35 of our brief, there are — it is a commonplace locution in State statutes and probably Federal statutes to use all or substantially all, which is more clearly quantitative. And the State statutes, these are often corporate law statutes that talk about the sale or alienation of all or substantially all of the assets. In that instance, the State — the cases we cited and many others give substantially all a quantitative as well as a qualitative interpretation. Breyer's Is it against the law, which I don't know, is it against the law for a patent holder on Patent X, which has 19 ingredients, to send one commonplace ingredient over to England and say, you know, I don't mind, here's what my patent's on here, but there is no British patent, and I would love you to make this and sell it in Britain? Is that against American law? It is not for two reasons. One, what you have to show under 271F is the act of active inducement. That is— Well, what he does is just what I said. You know, I have a great invention in America. It's patent. Okay. But in England, it's not patented. And what I really — I see no reason why you cannot make my thing over there and sell it over there. And here, by the way — it's not mine, you know, it's Mr. Smith's, my competitor's. And here, by the way, is the patent. You see what it is. And go ahead, sell it in England. It's not patented there. Can you not do that? Is that illegal? So there you would ask the question whether the component or two components You know, if we leave the component out of it, there are no components. What he does is he sends them a list. Is that illegal? Okay. That is not illegal because in addition to active inducement, you also have to supply a substantial portion of the components. Exactly. Now, as to that— So then the question becomes, one, of what limits Congress wanted to put in an area where it isn't illegal. Now go ahead with your argument, because what they're saying— Okay. So if the— Yeah. Yeah. Sorry. If the component is—let me use two examples. One, I'll adopt Justice Alito's hypothetical. Let's assume that you have a patented pharmaceutical, a tablet that, you know, remediates a disease. It has, as is commonplace in these combinations, it has one active ingredient and it has five inert ingredients that are as easy to pick up as you can imagine. The thing that is exported—the factory overseas, which, by the way, is never liable under this statute, because the statute only applies to conduct in the United States, they are happy to go down to their local warehouse and get the five inert ingredients. But the molecule that does all the work, they import from the United States. Now, my friends on the other side would say, and I believe Mr. Tripp actually did say, if that molecule has no non-infringing uses, it's illegal. But if it's such a great molecule that it actually has another non-infringing use, say it also powers the injectable form of the pharmaceutical, which is not patented, that what Congress intended to do was leave this giant donut hole in the rule between the active inducement of a commodity, that is, non-bespoke component. You have to—you know, there's no liability at all. You have to supply all or nearly all of those inert components. Or you have to show that, you know, there in fact is a patent on the injectable form. Or take also the example that was at issue in this Court's decision in Quanta Computer. Justice Thomas explained for the Court that that was a case that involved the patent exhaustion doctrine, where Intel was supplying a very sophisticated microchip, microprocessor, that was used by Quanta Computer in a computer that had, you know, a gazillion other components. And the question was whether Intel's sale of the microprocessor to LGE, which then sold it to Quanta, exhausted the patent. And what this Court said is, well, it didn't exhaust the patent on the combination because obviously it's only one or two components. But because that microchip, that microprocessor embodied the—I mean, what it said was the inventive aspect of the computer as a whole, we are going to take account of that and hold that patent exhaustion applies. And that would apply not only to my pharmaceutical example or Justice Alito's, you know, one super important component. It would apply to a more, you know, the Quanta example, where there may be, say, there are 20 components, but three of them constitute the inventive aspect. This, the language is capacious enough and can be read in a common-sense way to make clear that that is what Congress intended to address in F-1 by enacting as provided there is active encouragement for the combination by enacting the analog, the F analog, to what is active inducement under B. So how do you decide, here there are five, and only one? Is manufactured in the United States. Under your test, where there are five, and let's assume that each one is necessary to the operation of the patented device, how do you decide if one is substantial, one out of five? Waxman. I'm going to answer your question, but first of all, let me simply correct a couple of statements by my friend. I think in response to your earlier question, Justice Ginsburg, the evidence in this case was that as to 300-plus million of the 700 million in sales, two components were supplied. There was a concession at trial that both primers and the TAC polymerase were supplied for almost half of the kits. Second of all, TAC polymerase, notwithstanding my friend's reference to what he found on the internet, the testimony at trial is that the TAC polymerase that is necessary to make these STR kits sufficiently reliable to be commercially saleable was, and there was a TAC polymerase made by Roche called Ampligold Plus, which is a particular form and was required, and the testimony at trial was, was manufactured by Roche, Promega, and Life only in the United States. This is not your Amazon.com TAC that's now available. Now, as to your question, Justice Ginsburg, the question of whether in this case, whether it was stipulated, it was conceded there were five components, although I must say I'm not sure that's right, that of the five components, one or two were exported, and the question is, how do you know whether that one or two is sufficient? That was addressed as a factual question by the jury. And the jury go about deciding that. Well, it's interesting in this case, because for other reasons, Life Technologies at other points of the trial wanted to emphasize just how important and unique this form of TAC was. It didn't actually argue to the jury that it wasn't a substantial portion. Our lawyers argued in their, in their initial closing and on rebuttal, look, these kits all had TAC polymerase. That is a substantial component. There was no request that the jury be instructed as to how you determine what is or isn't substantial. And the way the Federal Circuit, the question for the Federal Circuit was, you know, is one sufficient or is two sufficient? And if I can just finish my sentence and then I'll the Federal Circuit dealt with this as a substantial evidence question. They weren't holding that one is sufficient in this case. They asked whether there was sufficient evidence to go to the jury. And they concluded that the answer was yes, because all of the testimony, and there were days of testimony about how polymerase works and the polymerase chain reaction. All of the testimony from our witnesses and their witnesses emphasized just how important TAC polymerase was. So it's a substantial. Roberts. I think you've finished your sentence. Thank you very much. Justice Sotomayor. Sotomayor. It seems to me that what you appear to be saying is still not answering your adversary's position. If there are, as I understood the expert testimony from the briefing, and I could be wrong, and you'll correct me on that, but assume my hypothetical, that there are three substantial components in this invention, how is one substantial number of those three substantial ones? Because unless you can explain that, I don't know how to give meaning to all or substantially all the components. And I do find the government's argument that it's hard to say that substantial means just something that's critical to the invention. Every step is critical to an invention. You take out the step, the invention doesn't work. So it's not part of our argument, and we don't think it's a fair reading of the Federal Circuit's decision, that says, look, if the thing won't work without a component, it's a substantial portion of the components. That is a caricature of what the Court decided. The Court, as I said, was engaging in deferential substantial evidence review. It recounted the fact that both their witnesses and our witnesses underscored how important TAC was. It didn't catalog the pages and pages of testimony explaining why that's the case. If you're asking me the hypothetical question, if all the jury heard was, and the jury heard nothing more than there are five components and three are important, would that be sufficient for a jury to include to conclude that one was a substantial component? I wouldn't say so. But that's a caricature of what actually happened in an eight-day trial that was very much focused on TAC polymerase and the particular form of TAC that was supplied here. And so this Court could, if this Court agrees with us that there may be circumstances, maybe it's the Quanta example or maybe it's Justice Alito's example, in which one component constitutes a sub --" could constitute a substantial portion and therefore liability would apply if there were conduct that amounted to active inducement, this Court could then say, okay, we're going to roll up our sleeves and we're going to read the trial transcript and we're going to look at what the evidence was in order to determine whether on the case as it was tried here, a reasonable juror could find that TAC polymerase was that important. Alito Well, in order to do that, it would be necessary to know what substantial portion of the components means. So what would you tell a jury that means? Waxman So I would tell a jury, you know, following the dictionary definitions, that substantial means considerable in importance and or amount, and then, you know, the jury will and you may consider, you know, whatever factors are introduced in the case, just as when, as this Court has explained, when juries have to decide things like, just adverting to your opinion announced today, what is materiality? In Basic v. Levinson, this Court rejected advocacy that you've got to tell the jury a lot of primary conduct depends on what materiality means. And what this Court said is the contours of that will be explicated based on the facts of the case and case law as it develops. And in the patent context, this Court has been, I wouldn't say single-minded, but very active in making, in rejecting formulations that, you know, help a jury determine what is obvious in light of prior art. That was KSR. What is equivalent, substantial equivalent under the Doctrine of Equivalence in Warner-Jenkinson? These are all instances in which this Court said the jury is given the standard, and it then applies the facts and circumstances to determine its met, just as it does in negligence cases and in criminal law cases and many other contexts in which primary conduct is being adjusted. Here, the primary, this parade of horribles that, gee, anybody who supplies a component from the United States could be liable if they're in the supply chain, is, is manifest ly incorrect. They have to, they have to, number one, know that there is a patent. They have to know that the product is going to be combined with others. They have to know that the combination, if practiced in the United States, would infringe. They have to go beyond that and actively encourage, send instructions or blueprints or something in order to do it, and a jury, properly instructed, based on the evidence, has to ascertain, gee, this really is a substantial portion. This is the molecule. Kennedy, that sounds to me much more like F-2 than F-1, but I'll look at that. The brief by Agilent Technologies was instructive for me as to how modern supply chains work. They say it's very complex. They ship out hundreds of different things. And that seems to me to give some help to the Petitioner because it shows that a quantitative test is simply a good baseline to begin with. And the more egregious cases, it seems to me, are under F-2 anyway. If we have, if we can think of horror stories, they're mostly covered by F-2, aren't they? Waxman. I don't think so, Justice Kennedy. I guess I'd make two points with respect to the supply chain. The liability in this, this is a provision modeled on 271B. It also includes the requirement of the domestic supply of a portion of the components. But the sauce here, where the rubber meets the road, is that the tortuous conduct is the active inducement. And somebody who is simply responding to an order for supplies is in no way at risk in this case. The reason that F-2 doesn't really solve the problem is, again, I think pointed out by Justice Alito's question. You can have a molecule that has, that does all the therapeutic work in the world. And you get, and it is protected against circumvention only if it has no substantial non-infringing uses. Many of the most important, innovative, inventive components actually are terrific because they have two uses. In my hypothetical, it has a use for an injectable form of the drug, which is not patented. It is not reasonable to assume that the Congress that, I was going to make a reference to the exchange in the legislative history, but the Congress that responded to the government's suggestion like, let's just have F-2, and said, well, we need, we need F-1-2, that is. We need the analog not just to contributory infringement, but to induced infringement. That they would have seen these two components as so far apart that their gears never mesh, when, as this Court has said, it is a commonplace that there is overlap between 270, between contributory and induced infringement. It's not a complete overlap. Oh, no, no, not at all. Not at all. What Deep South said is, the patent is on the combination. If the combination occurs overseas, there is no infringement. There is no 271A liability abroad. Congress didn't touch that. What it said was, okay, 271A is direct infringement, 271B and C are what we call secondary infringement. It makes somebody liable, even if they weren't infringing. And because the combination overseas doesn't infringe the U.S. patent, we are going to enact these two provisions that address only U.S. conduct. The tort of 271F-1-2- Only U.S. conduct, but you read the brief of the German companies, and they say it's a fairly common thing. We've been making product X forever, and now we invest in an American company, and lo and behold, we just want to import some wood, you know, just some wood. And we can't do it, because we'll be had up under this, because wood is an important some kind of 30 percent of some kind of a patented thing that we've been making for years. So they're worried about it, in other words. I think that they're worried is validated by a correct understanding of the statute. Their concern makes no mention of the requirement that the U.S. manufacturer not send wood, but send a substantial portion of the components, which wouldn't be wood or saline solution or something like that, and importantly, has to take the additional steps of actively inducing. And in Grokster, this Court, when it was underscoring what active inducement means, said, quote, showing that the infringement was encouraged overcomes the law's reluctance to find liability when a defendant merely sells a commercial product suitable for some unlawful use. And that is the point. The point here is that we're talking about conduct that occurs only in the United States that must require, that must include the active inducement, specific intent and knowledge, and a component or components that constitute a substantial portion of the components of the invention. And the notion of the notion of life technologies sold this polymer to another company that it hadn't had a relationship with, would that other company be considered to be infringing? No. No. I mean, unless, when you say life, in other words, if from the United States Any company, any other company but Life Technologies could have taken this expired patent in England and brought all of these, this component, this polymer from the United States, and it wouldn't be liable? The importation of the, may I finish? Sure. The importation of the polymer is not reached. A foreign, a foreign assembler who imports something from the United States is not exempt. Thank you, counsel. Four minutes, Mr. Phillips. Thank you, Mr. Chief Justice. I don't intend to use all four minutes. First of all, what I want to respond to is, you know, my friend has spent a lot of time talking about active inducement and the mens rea elements of 271, and I understand that, and that's certainly a significant protection. But Congress did not take 271B and C and simply apply them in the F-1 context, in the F-2 context. What it said is there has to be a substantial portion, all or a substantial portion. And that's a fundamentally significant independent requirement that cannot be satisfied in a situation where you're talking about a single component. Justice Sotomayor, I just wanted to respond to your, you know, the three that are major. It's important to recognize that two of those are clearly not coming from the United States. So I go back to the point you made later, which is if there are three major components, how can one of them be the substantial one? I think the answer is it cannot be under those circumstances. Justice Kennedy, you asked the question about, you know, what are we supposed to do in these circumstances as, you know, with supply chains? And the answer is, the answer that my colleague gave you is one that basically says this is a recipe for the trolls of the world to go and chase down every supply opportunity and do what? Send them notice that what you're sending is a staple article that's a major component of a piece that's in a patent and that if you keep sending that, you're going to violate that patent and we're going to come after you. And what's that going to do? That's going to disrupt the supply chain in the United States and the ultimate effect is going to be twofold. Either purchasers outside the U.S. will stop purchasing from inside the U.S. or U.S. manufacturers will go offshore. And the one thing we know, the 271F was never intended to do, was to accomplish that kind of an impact, negative impact on the U.S. economy. I urge the Court to reinstate the judgment as a matter of law that the District Court entered. Thank you, Your Honors. Thank you, Counsel. The case is submitted.